OPINION OF THE COURT
Feinman, J.
Although raised in the context of a purported “cross motion,” resolution of this appeal requires us to once again revisit the issue of untimely summary judgment motions. As defendant Hospital for Special Surgery (together with codefendants Frelinghuysen and Girardi, HSS) concedes, its cross motion was untimely, and it did not allege any good cause for its delay. Accordingly, the cross motion was properly denied, regardless of its merits.
In 1994, when plaintiff was 53 years old, he underwent spinal surgery at defendant Hospital for Special Surgery, to address multilevel cervical stenosis with myelopathy and radiculopathy which, over the course of five years, had led to progressive weakness in his left shoulder and upper extremities. After surgery, he was pain-free but did not recover a full range of motion in his upper left arm.
About eight years later, in March 2002, plaintiff returned to HSS complaining of lower back pain and severe left leg pain; he was treated with a course of steroid injections. In April 2003, plaintiff again returned because he was experiencing increased weakness in his right upper arm. He was found to have “significant” cervical stenosis and compression of his spinal cord, as well as cord signal change especially at C3-4 and C4-5. Plaintiff had “significant C-5 weakness of the right upper extremity.” The clinic notes indicated that plaintiff “need[ed] a decompression at C3-4, C4-5 and C6-7,” that “probably” this would be done in an anterior approach, and that “surgery will be booked in the near future.” At a follow-up visit in June 2003, he was told that he might not fully recover his right arm motor loss; he was “somewhat disappointed” but acknowledged that his 1994 surgery had a similar result as to his left side. The clinic notes also indicate that plaintiff told the examining physician that he had recently secured a job and was not interested “whatsoever” *78 in immediate surgery; plaintiff disputes this and says he was not working at that time.
Plaintiff returned to HSS in June 2004 complaining of increasing right shoulder dysfunction and neck pain, and decreasing balance. He was no longer working and was receiving social security disability benefits. The clinic notes of June 11, 2004 indicate that his “symptoms have progressed with increased right shoulder atrophy”; a new round of studies was scheduled. On October 1, 2004, plaintiff first met with defendants Peter Frelinghuysen, M.D. and Federico Pablo Girardi, M.D., both orthopedic surgeons at HSS. According to the clinic notes, the doctors advised plaintiff that surgery would likely not result in the return of muscle function, but that there was “a slight chance” of improvement.
He met with another HSS doctor on October 22, 2004, who wrote that the plan was to have plaintiff return in November to see Frelinghuysen “for booking of his anterior disc fusion surgery.” At his next visit on November 12, 2004, a different doctor indicated in the clinic notes that Frelinghuysen and Girardi had recommended “what sounds like a two-level anterior cervical decompression and fusion,” and that plaintiff would follow up in one week “to discuss surgery” with Frelinghuysen.[1] The notes also indicate that this doctor explained to plaintiff that the reason to do surgery would be to prevent worsening of his symptoms. The doctor also noted that plaintiffs “only option” might be a future shoulder arthrodesis “to allow him to have a more functional lifestyle.” On November 19, 2004, the clinic notes indicate that Frelinghuysen planned to review the patient films with Girardi and “we will plan for an anterior cervical decompression and fusion at a later date.” According to plaintiff, he understood that surgery would be performed in late December, and he began obtaining the necessary medical clearances.
Plaintiff testified that on his third visit with Frelinghuysen in December 2004, the doctor told him that they could not do the surgery, but did not give him “a reason that made any sense.” In Frelinghuysen’s words, he and Girardi decided that surgery “would not help.” According to Girardi, after viewing the films, in his opinion the severity of plaintiffs spinal disease and the low prospect of improvement did not warrant the risks of *79 surgery. If the issue had been compression, surgery would have been performed to prevent further progression, but due to the degeneration of the spinal cord, decompressive laminectomies would have done little or nothing to address plaintiffs upper extremity issues.
In February 2005, plaintiff sought treatment at defendant New York University Medical Center Hospital for Joint Diseases (HJD). According to the patient notes, the examining physician found severe upper extremity atrophy. After review of the MRI, he determined that no further surgery for the cervical spine was indicated and that there should be no lumbar spine surgery “at this time.” Physical therapy, pain management and treatment in HJD’s neurology, hand and shoulder clinics were recommended. Plaintiff undertook these programs through HJD’s clinic, and was treated continuously until September of 2005. An MRI taken of his right shoulder in May 2005 showed “severe atrophy” of certain muscles and “mild atrophy” of other muscles, “likely due to the patient’s cervical myelomalacia.” An MRI of his cervical spine taken the same day found “severe central canal and severe neural foraminal stenosis,” resulting in “severe myelomalacia of the spinal cord” from C3 to mid-C5 level.
While continuing at HJD, plaintiff also sought treatment at Mt. Sinai, where he was first seen in the orthopedic clinic on April 21, 2005. The progress notes from June 25, 2005 indicate, in part, that he had “marked stenosis throughout spine,” and “marked atrophy at both shoulder girdles.” In July 2005, he was examined by an orthopedic surgeon who determined that plaintiff needed surgery to prevent his condition from worsening, not in order to regain function. Plaintiff underwent a two-stage cervical spine surgery in December 2005. Postoperatively, in February and April 2006, plaintiff indicated that he felt returning strength in his right arm although not his left, and a general “slow improvement.” The Mt. Sinai orthopedic surgeon observed that he did not “see a substantial neurologic improvement on [his] objective testing, but the patient does feel subjectively like he is improving.”
Ten months after the surgery at Mt. Sinai, in October 2006, plaintiff returned to HJD’s neurology clinic, reporting a lack of improvement in upper extremity strength, and some pain and numbness in the right arm and hand. Electrical studies performed on October 26, 2006 revealed no significant change from those done in 2005 although there was evidence of fibrotic *80 changes; the studies showed the presence of moderate right and mild left carpal tunnel syndrome.
Plaintiff commenced his lawsuit in May 2007, claiming medical malpractice and failure to secure informed consent. The gravamen of his claim is that HSS and HJD failed to timely perform surgery upon him, leaving him with neurological and muscular damage that would not have occurred had the surgery been performed earlier.
HJD timely moved for summary judgment on November 11, 2011. Its motion papers included an affidavit of a medical expert who discussed plaintiffs medical history as seen in the records. In the opinion of HJD’s expert, surgery would have been an “unjustifiable and extraordinarily risky and aggressive treatment option,” as no surgery would have been able to reverse plaintiffs “significant” neurological deficits that had existed for many years. The best that surgery could do was stop the myelopathy, but there was risk of permanent paralysis or death, “well beyond the standard for such risks for cervical spine cases.” He further opined that there was no identifiable injury sustained in the four-month period between plaintiffs first visit at HJD and when he first went to Mt. Sinai.
By notice of cross motion dated January 10, 2012, HSS moved for summary judgment and dismissal, relying on HJD’s expert’s affidavit and that of defendant Girardi. HSS also argued that the claim of lack of informed consent should be dismissed, given that no procedure requiring consent had been performed. HSS admitted that its motion seeking summary judgment and dismissal of the complaint as against it was filed nearly two months after the court-imposed deadline for making dispositive motions,[2] but argued that it should be considered because it sought relief on the same issues raised in codefendant HJD’s timely motion.
Plaintiff opposed defendants’ motions for summary judgment, although he did not address the claim of lack of informed consent. He submitted the affidavit of his medical expert, Michael J. Murphy, M.D., an orthopedic surgeon practicing in Connecticut. According to the affidavit, Murphy reviewed the medical records and opined that surgery for plaintiff was “indicated as early as June 2003 when the diagnosis of cervical spondylitic *81 myelopathy was made,” and from that time until December 2005 when surgery was performed, plaintiffs neurological condition deteriorated. He further opined that had the surgery been performed in 2003, plaintiffs “final outcome would have been substantially improved and he would not have sustained such a severe degree of weakness and loss of function of his right upper extremity.” Dr. Murphy stated that the delays were a departure from the standards of good medical practice.
The motion court granted HJD’s motion and denied the motion of HSS. As to HJD, the court found that, “without any doubt, [its] moving papers, primarily through the thorough opinions expressed by [its expert], [made] out a prima facie case for the relief sought.” In opposition, Murphy’s opinions were “somewhat conclusory.” He did not separate the claims plaintiff made against HJD and HSS, and did not address the opinions of HJD’s expert regarding causation. Thus, plaintiff failed to rebut HJD’s prima facie entitlement to summary judgment.
As to HSS, the court clearly held that because the cross motion was filed impermissibly late with no reason offered for the lateness, it should be denied. The court then went on to comment in dicta that if its merits were examined, summary dismissal should be denied as there are substantial questions of fact barring summary resolution. It wrote,
“The question remains whether HSS should remain a viable defendant in this case. The answer is yes. First of all, under the authority of Brill [2 NY3d 648 (2004)], the cross[ ]motion was clearly untimely without any explanation, and counsel is simply wrong when he argues that the cross[ ]motion raises the same issues as the motion timely made by [HJD]. Differences necessarily exist because [plaintiff] was a patient at HSS for an extended time before he came to [HJD]. At [HJD] he was a patient from only February 2005 to September 2005, and he was also a patient at Mt. Sinai for much of that time. Therefore, the motion must be denied as untimely.”
Thus, the rationale for the court’s denial was articulated as being that the “cross motion” was untimely.
HSS appealed from the denial of its “cross motion” and plaintiff cross-appealed from the grant of HJD’s motion.
To prevail on a summary judgment motion, the moving party must produce evidentiary proof in admissible form sufficient to warrant the direction of summary judgment in his or her favor *82 (GTF Mktg. v Colonial Aluminum Sales, 66 NY2d 965, 967 [1985]). Once this burden is met, the burden shifts to the opposing party to submit proof in admissible form sufficient to create a question of fact requiring a trial (Kosson v Algaze, 84 NY2d 1019 [1995]). When deciding a motion for summary judgment, the court’s function is issue finding rather than issue determination (see Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957]). The evidence will be construed in the light most favorable to the one moved against (see Young v New York City Health & Hosps. Corp., 91 NY2d 291, 296 [1998]; Bielat v Montrose, 272 AD2d 251, 251 [1st Dept 2000]).
The motion court properly dismissed the case as against HJD. HJD met its burden of showing prima facie entitlement to summary judgment, proffering evidence that plaintiff was not caused to suffer any injury between February 2005 when HJD found that surgery was not indicated, and April 2005 when he first consulted with Mt. Sinai. In opposition plaintiff’s expert did not offer an opinion as to what specific injury plaintiff endured as a result of HJD’s decision not to perform surgery and made only broad conjectures which were insufficient to defeat HJD’s motion (see Foster-Sturrup v Long, 95 AD3d 726 [1st Dept 2012]; Callistro v Bebbington, 94 AD3d 408 [1st Dept 2012], affd 20 NY3d 945 [2012]). In addition, the motion court correctly dismissed the second cause of action alleging lack of informed consent as plaintiffs papers did not address this claim.
The motion court also correctly denied summary judgment to HSS because its motion was untimely made without any explanation for its untimeliness, let alone good cause {see CPLR 3212 [a]).
Plaintiff filed his note of issue on August 24, 2011. Thereafter, the motion court issued an order which provided that “[t]he time for the various defendants to move for summary judgment is extended through November 14, 2011.” On November 11, 2011, HJD moved for summary judgment, making its motion returnable on December 14, 2011. On January 10, 2012, well after the deadline for dispositive motions had passed, HSS “cross-moved” for summary judgment without providing any explanation whatsoever for its delay. HSS argued to the motion court, as it does to this Court, that its motion should be considered on the merits because it merely presents the same arguments made by HJD. In opposing the “cross motion,” the plaintiff argued that it was untimely, and, secondarily, that it was devoid of merit.
*83 Brill v City of New York (2 NY3d 648 [2004]) addressed the “recurring scenario” of litigants filing late summary judgment motions, in effect “ignoring] statutory law, disrupting] trial calendars, and undermining] the goals of orderliness and efficiency in state court practice” (2 NY3d at 650). Brill holds that to rein in these late motions, brought as late as shortly before trial, CPLR 3212 (a) requires that motions for summary judgment must be brought within 120 days of the filing of the note of issue or the time established by the court; where a motion is untimely, the movant must show good cause for the delay, otherwise the late motion will not be addressed (see Isolabella v Sapir, 96 AD3d 427, 427 [1st Dept 2012]). In Brill, the City of New York moved for summary judgment on the basis that it never had notice of the defect and therefore could not be liable for the plaintiffs personal injuries by law. Quite likely, the City’s legal argument would have been dispositive. However, the City gave no explanation for why its motion was made close to a year after the trial calendar papers were filed. Accordingly, the Court of Appeals refused to address the motion on its merits, pursuant to CPLR 3212 (a).
Brill draws a bright line based on the two elements of CPLR 3212 (a): the statutorily-imposed or court-imposed deadlines for filing summary judgment motions, and the showing of good cause by a late movant in order for its motion to be considered. In Brill the Court of Appeals indicated that late-filed summary judgment motions are “another example of sloppy practice threatening the integrity of our judicial system” (2 NY3d at 653 [emphasis added]), and pointed to its earlier decision, Kihl v Pfeffer (94 NY2d 118 [1999]), which affirmed dismissal of the complaint because the plaintiff failed to respond to a court order within the court-ordered time frame. Brill reiterates KihVs statement that, “ ‘[i]f the credibility of court orders and the integrity of our judicial system are to be maintained, a litigant cannot ignore court orders with impunity’ ” (2 NY3d at 652-653, quoting Kihl at 123).
While the Brill rule may have caused some practitioners and courts to wince at its bright line, by the time the motions at issue in this case were made, the Court of Appeals had already reiterated on more than one occasion, and in varying contexts, that it meant what it said (see Gibbs v St. Barnabas Hosp., 16 NY3d 74 [2010] [dismissal after repeated failures to serve bill of particulars and noncompliance with enforcement order], citing Brill; Andrea v Arnone, Hedin, Casker, Kennedy & Drake, *84 Architects & Landscape Architects, P.C. [Habiterra Assoc.], 5 NY3d 514 [2005] [dismissal after ongoing failure to comply with discovery orders], citing Brill; Miceli v State Farm Mut. Auto. Ins. Co., 3 NY3d 725 [2004] [denying untimely filed summary judgment motion because although the plaintiff argued she had meritorious case, no reasonable excuse was provided as to the motion’s late filing], citing Brill; see also Casas v Consolidated Edison Co. of N.Y., Inc., 105 AD3d 471 [1st Dept 2013] [upholding order striking answer where the defendant offered no reasonable excuse for its failure to comply with discovery order and provide a meritorious defense]).[3]
As most recently articulated in Gibbs:
“The failure to comply with deadlines not only impairs the efficient functioning of the courts and the adjudication of claims, but it places jurists unnecessarily in the position of having to order enforcement remedies to respond to the delinquent conduct of members of the bar, often to the detriment of the litigants they represent. Chronic noncompliance with deadlines breeds disrespect for the dictates of the Civil Practice Law and Rules and a culture in which cases can linger for years without resolution. Furthermore, those lawyers who engage their best efforts to comply with practice rules are also effectively penalized because they must somehow explain to their clients why they cannot secure timely responses from recalcitrant adversaries, which leads to the erosion of their attorney-client relationships as well” (16 NY3d at 81).
The dissent considers our application of Brill in this instance to be “rote,” and that our interpretation is antithetical to that decision’s policy considerations of preventing eve-of-trial summary judgment motions. It contends that in the interest of judicial economy we should not depart from “prior authority” that affords the court discretion to entertain a “marginally late filing” when there is merit to the application and no prejudice has been demonstrated, citing Burns v Gonzalez (307 AD2d 863 *85 [1st Dept 2003]) and Garrison v City of New York (300 AD2d 14 [1st Dept 2002], lv denied 99 NY2d 510 [2003]). The dissent would seemingly limit the reach of Brill to those actions where a party files a motion for summary judgment long after the deadline for dispositive motions and the matter is on the trial calendar. In our view, Brill expresses the Court’s overall desire to curb “sloppy” litigation practices, one of them being late summary judgment motions. The dissent’s approach of judging a motion’s merits without consideration of why it was untimely can only lead to uncertainty and additional litigation as motions clearly barred by Brill become arguably permissible because one of the litigants perceives the motion to have merit and perceives no prejudice to the other side. But most importantly, the dissent’s approach is in derogation of CPLR 3212 (a).
The dissent expresses concern about an extra burden to the courts and litigants if we strictly enforce Brill “without taking into consideration the circumstances of the case.” It reasons that because Brill emphasizes the advantages of summary judgment, with which we of course agree, those advantages outweigh a consistent application of the statute. However, bending the rule results in the practical elimination of the “good cause shown” aspect of CPLR 3212 (a), and the clear intent of Brill.
Unlike the dissent, we do not find that a straightforward interpretation of the statute, or Brill, leads to “absurd and unintended consequences,” especially as the Court of Appeals acknowledges in Brill that if the strictures of CPLR 3212 (a) are applied “as written and intended,” there may be situations where a meritorious summary judgment motion may be denied, “burdening the litigants and trial calendar with a case that in fact leaves nothing to try” as was the result in Brill (2 NY3d at 653). However, the solution, the Court of Appeals explains, is not for the courts to overlook or bend CPLR 3212 (a) to fit the particular circumstances, but for “practitioners [to] move for summary judgment within the prescribed time period or offer a legitimate reason for the delay” (id.). In other words, Brill calls on the courts to lead by enforcing the words of the statute, rather than let attorney practice slowly eat away at the integrity of our judicial system. When the courts consistently “reñiste] to countenance” violation of statutory time frames, there will be fewer instances of untimely, improperly labeled motions, because “movants will develop a habit of compliance” with the statutory and court-ordered time frames, and late motions will include a good cause reason for the delay (id.).
*86 We do not hold that when a summary judgment motion is filed past the deadline, the court must automatically reject it. Rather, we enforce the law as written by the legislature, and as explained in Brill. It is up to the litigant to show the court why the rule should be flexible in the particular circumstances, or, in the words of the statute, that there is “good cause shown” for the delay. Indeed, in our view, the dissent wrongly interprets the statute by claiming that the “good cause shown” prong is not always a part of the CPLR 3212 (a) analysis. There is nothing in the language of the statute to suggest this and it opens the door to abuse; once one movant has timely filed, any other party can argue that its motion, no matter when filed, should be addressed. The value of enforcing the terms of the statute as written is that attorneys will make sure their motions are timely filed or that there is a good reason for the lateness. Nonmovants will suffer no prejudice. The courts will no longer have to address the kinds of questions we address here. The result will be judicial economy, as well as lawyerly economy.
In the case at bar, HSS relies on Lapin v Atlantic Realty Apts. Co., LLC (48 AD3d 337 [1st Dept 2008]) for the principle that there is an exception to Brill for cases where a late motion or cross motion is essentially duplicative of a timely motion. However, the Court of Appeals intended no such exception, and to the extent this Court has created one, it did so, whether knowingly or unwittingly, by relying on precedents which predate Brill and which, if followed, will continue to perpetuate a culture of delay. This is clear by tracing Lapin’s antecedents.
Lapin is one in a line of cases holding that an untimely cross motion may be considered on its merits when it and the timely motion address essentially the same issues. Lapin relied on Altschuler v Gramatan Mgt., Inc. (27 AD3d 304 [1st Dept 2006]), which held it proper to consider the untimely “cross motion,” in particular because it was “largely based” on the same arguments raised in the timely motion for summary judgment, and the same findings would apply for both it and the timely motion. Altschuler, in turn, relied on a pre-Brill decision, James v Jamie Towers Hous. Co. (294 AD2d 268, 272 [1st Dept 2002], affd 99 NY2d 639 [2003]). In James, the defendant moved for summary judgment and the codefendant served its cross motion late but before the original motion had been decided; James held that the untimely cross motion should have been considered as the original motion was still pending and both could have been decided together.
*87 James, in turn, relied on Rosa v Macy Co. (272 AD2d 87 [1st Dept 2000]), where Macy moved for summary judgment and two other defendants untimely cross-moved against it for indemnity; the motion and another timely cross motion were still pending, and we held that the untimely cross motions should have been considered. In sum, an outdated, pre-Brill interpretation of the amended CPLR 3212 (a) continued to hold sway in Lapin.
It is true that since Brill was decided, this Court has held, on many occasions, that an untimely but correctly labeled cross motion may be considered at least as to the issues that are the same in both it and the motion, without needing to show good cause (see e.g. Palomo v 175th St. Realty Corp., 101 AD3d 579 [1st Dept 2012]; Conklin v Triborough Bridge & Tunnel Auth., 49 AD3d 320 [1st Dept 2008]; Filannino v Triborough Bridge & Tunnel Auth., 34 AD3d 280, 281-282 [1st Dept 2006], appeal dismissed 9 NY3d 862 [2007]; Osario v BRF Constr. Corp., 23 AD3d 202, 203 [1st Dept 2005]). Some decisions also reason that because CPLR 3212 (b) gives the court the power to search the record and grant summary judgment to any party without the necessity of a cross motion, the court may address an untimely cross motion at least as to the causes of action or issues that are the subject of the timely motion (see Filannino, 34 AD3d at 281, citing Dunham v Hilco Constr. Co., 89 NY2d 425, 429-430 [1996]). The problem in the case at bar is that HSS’s motion, in addition to being untimely, is not a true cross motion.
A cross motion is “merely a motion by any party against the party who made the original motion, made returnable at the same time as the original motion” (Patrick M. Connors, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C2215:l; see CPLR 2215). A cross motion offers several advantages to the movant. There is a shorter minimum notice requirement, three or seven days, as compared with the minimum eight-day notice requirement in CPLR 2214 (b). The cross movant may rely on the papers submitted with the main motion to support the relief sought. By making a cross motion, the party saves an extra day in court, and quite possibly the time and trouble of amassing fresh proof, if it happens that all or part of the evidentiary foundation on which the cross motion is based has already been produced for consideration (Patrick M. Connors, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C2215:l, C2215.-2).
*88 To the extent HSS’s motion was directed at the complaint, as opposed to any cross claims by HJD, and was not made returnable the same day as the original motion, it was not a cross motion as defined in CPLR 2215. The rule is that a cross motion is an improper vehicle for seeking relief from a nonmoving party (Mango v Long Is. Jewish-Hillside Med. Ctr., 123 AD2d 843 [2d Dept 1986]). While courts have deemed this mislabeling a “technical” defect which will be disregarded, particularly where the nonmovant does not object and it results in no prejudice to the nonmoving party (see Sheehan v Marshall, 9 AD3d 403, 404 [2d Dept 2004]), in this case the nature of nonmovant plaintiffs opposition is that there was prejudice because to the extent the court deems HSS’s motion a cross motion, the Brill rule is ignored.
Allowing movants to file untimely, mislabeled “cross motions” without good cause shown for the delay affords them an unfair and improper advantage. Were the motions properly labeled they would not be judicially considered without an explanation for the delay. Moreover, the exception discussed in Filannino allowing the courts to consider proper but untimely cross motions, at least as to issues shared with the original motion, addresses the dissent’s concern that a cross-moving party might be caused to file its motion late because it had insufficient time before the deadline occurred. Of course, it must be pointed out that the cross movant would have good cause for its late motion in that situation, and the cross motion would be evaluated on its merits (see e.g. Parker v LIJMC-Satellite Dialysis Facility, 92 AD3d 740, 741-742 [2d Dept 2012] [failure to receive significant outstanding discovery before the deadline for making motion for summary judgment provides good cause for allowing a late-filed motion for summary judgment]; see also Kase v H.E.E. Co., 95 AD3d 568, 569 [1st Dept 2012] [court’s clerical error, explained through an affidavit of the paralegal, provided good cause for granting the motion seeking renewal of the motion for summary judgment]).
The argument that HSS’s motion should be considered on the merits because it “sought relief on the same issues raised in HJD’s timely motion,” ignores the distinction in the CPLR between motions and cross motions and perpetuates an increasingly played end run around the Court of Appeals’ bright-line rule in Brill. Even if we were to find that the Court of Appeals intended for an exception to be carved out of Brill for incorrectly labeled “me too cross motions,” that is, motions relying *89 on the arguments and evidence of the originally filed motions, to the extent HSS’s motion against a nonmoving party can be properly considered such a motion, the motion court correctly found that it is not merely a duplication of HJD’s timely motion. HSS did not merely rely on the papers amassed by HJD, and as the motion court correctly noted, “ [differences [in the factual record] necessarily exist because [plaintiff] was a patient at HSS for an extended time before he came to [HJD]” and he was “a patient [at HJD] from only February 2005 to September 2005.”[4] There are sufficient discrepancies in the record and in the experts’ opinions that raise questions of fact regarding HSS’s course of treatment beginning in 2004, if not earlier. In particular, the records suggest that HSS believed surgery was appropriate and helpful as early as 2003, surgery is repeatedly mentioned in the records of 2004, and plaintiff believed that surgery had been scheduled. Plaintiff was a patient a much longer time at HSS than at HJD, surgery was positively discussed by the HSS defendants, and thus there are factual differences between the two defendants’ treatments. This is also reflected in their individual motion papers. The HSS “cross motion,” which runs from page 842 to page 1002 of the record on appeal, is comprised of many items not contained in the HJD motion papers, not the least of which is additional medical records not submitted by HJD. In short, the HSS “cross motion” was more than a late “me too” motion and should not have been considered on its merits.
Nor is this Court’s recent holding in Levinson v Mollah (105 AD3d 644 [1st Dept 2013]) on point. In Levinson we held that there was no reason to address whether one of the “cross motions” was untimely because the moving defendants’ timely motion had put plaintiff on notice that he needed to rebut the prima facie showing that he had not met the serious injury threshold; when the plaintiff in Levinson failed to do this, the complaint was correctly dismissed as to all codefendants. Here, however, because HSS and HJD have different treatment histories with plaintiff, HJD’s timely motion did not clearly put plaintiff on notice of the need to gather evidence in opposition to the arguments ultimately proffered by the HSS defendants.
We are concerned that the respect for court orders and statutory mandates and the authoritative voice of the Court of Appeals are undermined each time an untimely motion is consid *90 ered simply by labeling it a “cross motion” notwithstanding the absence of a reasonable explanation for its untimeliness. We therefore affirm the branch of the motion court’s order which denied HSS summary judgment as untimely made without consideration of its merits.
Finally, we note the dissent’s concern that allowing this litigation to proceed based on plaintiff’s particular theory of negligence could result in placing surgeons in an impossible situation either of performing a procedure that is deemed ill-advised and being subject to any liability for aggravation of a condition, or declining and being subject to liability for refusing to assume the risk that the surgery entails. Our decision is not one on the merits of plaintiff’s claim, and it is therefore premature to bemoan that we have opened a Pandora’s box for surgeons. Rather, it will be for a trial court and a jury to hear plaintiff’s case, and should plaintiff prevail, then, assuming a timely appeal is taken and perfected, and only then, will we have occasion to consider the merits of the claim against HSS.
Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered July 16, 2012, which, insofar as appealed from as limited by the briefs, granted the summary judgment motion of defendants Hospital for Special Surgery, Peter Frelinghuysen, and Federico Pablo Girardi only to the extent of dismissing plaintiffs claim of lack of informed consent, and otherwise denied the motion, should be affirmed, without costs; the judgment of the same court and Justice, entered August 20, 2012, dismissing the complaint as against defendant New York University Medical Center Hospital for Joint Diseases, should be affirmed, without costs.

. Girardi testified that the notation that he and Frelinghuysen had recommended any particular surgery was “incorrect.”

. Supreme Court’s extension of the time to file dispositive motions had given the parties a total of 82 days after the filing of the note of issue on August 24, 2011. As a point of reference, the statutory 120-day maximum expired on December 22, 2011.

. In Cadichon v Facelle (18 NY3d 230 [2011]), the Court reversed a “ministerial” dismissal based on the failure to timely file the note of issue because the trial court did not provide notice to the parties or issue a formal order; the decision notes that the record showed that neither set of parties acted “with expediency in moving th[e] case forward,” and that deadlines must not be disregarded (id. at 236, citing Andrea, Miceli, Brill, and Kihl).

. The dissent overlooks the very different lengths of treatment offered to plaintiff by HSS and HJD.