Genesis Merchant Partners, L.P. v Gilbride, Tusa, Last & Spellane, LLC (2018 NY Slip Op 00221)





Genesis Merchant Partners, L.P. v Gilbride, Tusa, Last & Spellane, LLC


2018 NY Slip Op 00221


Decided on January 11, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 11, 2018

Richter, J.P., Kapnick, Webber, Oing, Singh, JJ.


5051 653145/14

[*1]Genesis Merchant Partners, L.P., et al., Plaintiffs-Respondents,
v
Gilbride, Tusa, Last & Spellane, LLC, et al., Defendants-Appellants.


Wilson Elser Moskowitz Edelman & Dicker LLP, New York (Judy C. Selmeci of counsel), for appellants.
Law Office of Wallace Neel, P.C., New York (Wallace Neel of counsel), for respondents.



Order, Supreme Court, New York County (Nancy M. Bannon, J.), entered March 2, 2017, which granted plaintiffs' motion for summary judgment on the issue of liability for legal malpractice and for summary judgment dismissing the counterclaims, unanimously reversed, on the law, without costs, and the motion denied.
At issue on this appeal is whether plaintiffs Genesis Merchant Partners, L.P. and Genesis Merchant Partners II, L.P. (collectively, Genesis) are entitled to summary judgment on liability in this legal malpractice action premised the failure of defendant Gilbride, Tusa, Last & Spellane, LLC, and defendant attorneys in that firm, Jonathan M. Wells, Kenneth M. Gammill, Jr., and Charles S. Tusa (collectively, Gilbride) to perfect security interests in life insurance policies. Because issues of fact exist, Supreme Court erred in granting Genesis summary judgment.
The plaintiffs are related venture capital firms. Between 2008 and 2011, Genesis agreed to make four secured loans totaling $4.425 million to nonparty Progressive Capital Solutions LLC (Progressive) to finance Progressive's purchase of several portfolios of life insurance policies. The loans were to be secured, in part, by the insurance policies themselves. Portions of the loan proceeds were to be used to buy life insurance policies to collateralize the loans.
In May 2008, Genesis retained Gilbride to represent it in connection with the first of the loans, which Progressive repaid. Gilbride also represented Genesis in connection with three additional loans, issued on December 22, 2008, July 31, 2009, and February 3, 2011 (respectively, the second, third and fourth loans).
It is undisputed that Gilbride drafted the loan documents, including the Collateral Assignment of Contracts and the UCC-1 financing statements for each loan. Gilbride filed a UCC-1 financing statement on May 27, 2008, for the first loan, listing Progressive as the Debtor and Genesis as the Secured Party and broadly declaring a security interest in all of Progressive's assets. The UCC-1 financing statements for the second, third and fourth loans, also filed by Gilbride, contained similar declarations. However, the UCC-1 financing statement for the fourth loan also listed, for the first time, the policy numbers of each insurer for seventeen life insurance policies pledged as additional collateral.
Progressive defaulted on the latter three loans. Genesis brought a lawsuit against Progressive in Connecticut. The parties entered into a settlement that imposed additional performance and payment obligations upon Progressive. Progressive defaulted on the settlement. Thereafter, Genesis contacted the underwriting insurers to collect on the life insurance policies. The underwriters refused to give Genesis any information or proceeds in connection with the insurance policies because they had no record of the collateral assignments to Genesis.
Genesis commenced this action, alleging that Gilbride committed legal malpractice by failing to perfect Genesis's security interests in the life insurance policies that served as collateral [*2]on the second, third and fourth loans, resulting in the loss of millions of dollars on life insurance policies valued at more than $84 million. Gilbride denied committing legal malpractice and counterclaimed for $112,000 in unpaid attorneys' fees on the theories of quantum meruit and account stated.
The crux of the factual dispute is whether Gilbride had a duty to perfect Genesis's security interests in the collateral. Genesis alleges that Gilbride was retained to advise it on the loans, including drafting the loan documents and ensuring that Genesis's security interests in the collateral were secured and perfected under applicable law. Gilbride maintains that it was retained only to draft the loan documents and that this limited representation was at the express instruction of Genesis.
Article 9 of the UCC regulates security interests to personal property, permitting creditors to protect their interest in collateral held by debtors or third parties (Badillo v Tower Ins. Co. of N.Y., 92 NY2d 790, 794 [1999]). However, article 9 "does not apply to. . .a transfer of an interest in or assignment of a claim under a policy of insurance" (UCC 9-109[d][8]).
A security interest in the proceeds of an insurance policy may be created by possession of the policy (Matter of Bickford's Estate, 265 App Div. 266, 268 [3d Dept 1942]; Cornell v Cornell, 54 NYS2d 434, 435-436 [Sup Ct, NY County 1945], affd 269 App Div. 931 [1st Dept 1945]). Alternatively, a creditor may obtain collateral assignment of the policies. This process entails obtaining signed documents that assign the benefits to the creditor — in this case, Genesis — and then filing them with the carriers for the insurance policies. Here, it is undisputed that the security interests in the life insurance policies were not perfected.
Supreme Court granted Genesis summary judgment, rejecting Gilbride's contention that perfecting the security interests was outside the scope of its representation. The court held — on a theory not raised by the parties in the briefing below — that even if Gilbride ultimately established that the scope of representation was limited at Genesis's instructions, Gilbride "voluntarily assumed the obligation to perfect the security interests," by filing the UCC-1 financing statements and billing Genesis for that work, and that Gilbride negligently discharged that duty. The court dismissed the counterclaims for unpaid attorneys' fees, as Gilbride sought payment for the same work that constituted malpractice.
Standard of Review
We start with the familiar legal principle that summary judgment is a drastic remedy, to be granted only where the moving party has "tender[ed] sufficient evidence to demonstrate the absence of any material issues of fact" (Kebbeh v City of New York, 113 AD3d 512, 512 [1st Dept 2014], quoting Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). When the movant fails to make this prima facie showing, the motion must be denied, "regardless of the sufficiency of the opposing papers" (id.). When deciding a motion for summary judgment, the court's function is issue finding rather than issue determination (Kershaw v Hospital for Special Surgery, 114 AD3d 75, 82 [1st Dept 2013]). Moreover, the evidence will be construed in the light most favorable to the nonmoving party (id.). Summary judgment must be denied "where there is any doubt as to the existence of a triable issue" (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978] [internal quotation marks omitted]) or where "the issue is arguable" (Glick & Dolleck v Tri-Pac Export Corp., 22 NY2d 439, 441 [1968] [internal quotation marks omitted]).
The Scope of Gilbride's Representation
On this record, the parties' competing affidavits, the Collateral Assignment of Contracts, and the emails raise issues of fact as to whether Gilbride's role was limited to drafting the loan documents and preparing the closing binders at the specific instructions of Genesis.
There is no engagement letter that defines the scope of Gilbride's representation. Steven Sands, Senior Portfolio Manager of Genesis, states in an affidavit that "[Genesis] initially retained [Gilbride] to draft loan documents for a loan to [Progressive] that required collateral assignments of life insurance policies and other assets as collateral for the loan. This engagement included perfecting the collateral."
Jonathan Wells, an attorney at Gilbride who represented Genesis, disputes that the law firm had a duty to perfect the security interests. He states that "Genesis specifically restricted Gilbride from undertaking" the tasks of the actual filing of the collateral assignment forms.
In order for Gilbride to limit the scope of its representation, it had a duty to ensure that Genesis understood the limits of its representation (see Unger v Horowitz, 8 AD3d 62, 63 [1st Dept 2004]; Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.2[c] ["A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, the client gives informed consent and where necessary notice is provided to the tribunal and/or opposing counsel"]). An attorney may not be held liable for failing to act outside the scope of the retainer (AmBase Corp. v Davis Polk & Wardwell, 8 NY3d 428 [2007]).
Here, the Collateral Assignment of Contracts raises a question as to the scope of the representation. Section 11(c) of the contract provides, in relevant part, that
"[a]dditionally, [Progressive] shall deliver to [Genesis] evidence of perfection of [Genesis's] security interest in, and evidence of the acceptance of filing of Assignments of Policy as Collateral Security Agreements, or their equivalent, in favor of [Genesis], from the respective insurance carriers with regard to the Contracts within twenty one (21) business days of the date hereof."
The provision unambiguously requires Progressive to deliver to Genesis documents evidencing perfection of Genesis's security interest in, and the acceptance of, the collateral assignment agreements from the insurance carriers.
Gilbride asserts that the final provision was added at Genesis's insistence and that it included the mechanism and direction for perfecting the security interests. Wells maintains that the structuring and negotiation of the loans were between Genesis and Progressive as evidenced by the draft term sheets.
In addition, the provision suggests that Progressive and Genesis, not Gilbride, were tasked with the responsibility of taking the mechanical steps necessary to perfect the security interest. Furthermore, the provision arguably supports Gilbride's position that despite the filing of the UCC-1 financing statements, the parties understood that the security interests in the insurance policies could only be perfected by Genesis obtaining a collateral assignment of the policies.
The emails in the record similarly raise questions as to the scope of Gilbride's representation. Wells states that while representing Genesis, he communicated with Timothy W. Doede (now deceased), former Portfolio Manager of Genesis, and Chris Kelly, the former Chief Compliance Officer, Chief Operating Officer and General Counsel of the investment manager to Genesis. Wells maintains that he was instructed by Doede that Genesis would handle everything related to the insurance policies. Wells also cites to an email where he inquired of Chris Kelly whether "[Kelly was] coordinating executing and delivering" what Progressive needs regarding the assignments. Kelly's response was "Done," arguably implying that Genesis was responsible for the assignments.
Genesis maintains that the emails show otherwise. It references emails that suggest that Gilbride was seeking to record the collateral assignments. For example, on January 31, 2011, prior to the closing of Loan 4, Wells asked John Puglisi at Progressive, "[W]hat is the best case timing to file the Assignments with carriers? Is there a way to expedite that like electronic filing?" Wells asked shortly afterward, "Would carrier provide fax confirm they are processing the assignment request?" Puglisi replied, "I am going down the carrier list now to come back with a detailed explanation regarding the [assignments] — [carrier process can differ]" (first brackets added). In addition, on February 3, 2011, when Genesis told Wells, a partner at Gilbride, that it was ready to wire $2.5 million, Loan 4, to Progressive, Wells replied, "Let me know when the wire goes out, [sic] I will immediately file the UCC." In short, both parties can point to emails that support their positions as to the scope of representation.
Accordingly, there are issues of fact as to the scope of Gilbride's representation, and if limited, whether Gilbride ensured that Genesis understood that Gilbride was not responsible for perfecting the security interests in the life insurance policies.
Voluntary Assumption of a Duty to Perfect
Turning next to whether Gilbride voluntarily assumed the duty to perfect the security [*3]interests, we note that the parties have not brought to our attention legal malpractice claims where an attorney voluntarily assumes a duty to act. The cases relied on by Supreme Court are distinguishable as they do not relate to a claim for legal malpractice arising from a dispute over the scope of the retainer (AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 594 [2005] [assumption of duty by underwriter or issuer of securities]; Applewhite v Accuhealth, Inc., 21 NY3d 420, 430-431, 434 [2013] [assumption of special duty by a municipality in a negligence claim]; Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579 [1994] [maintenance contractor for hospital assumed duty to noncontracting nurse for injuries she sustained when fan dismounted from wall]; Podesta v Assumable Homes Dev. II Corp., 137 AD3d 767 [2d Dept 2016] [assumption of duty by vendors of real property to record partial satisfaction of mortgage]; Nilazra, Inc. v Karakus, Inc., 136 AD3d 994 [2d Dept 2016] [third-party action for contribution and indemnification by attorney defendant against another attorney, who voluntarily assumed a duty to file a notification with the state in connection with the purchase of a business]).
Even assuming that the duty principles in the aforementioned cases can be applied to a legal malpractice claim, Gilbride's filing of the UCC-1 financing statements and billing Genesis for that work does not establish that summary judgment is warranted on this record.
Gilbride acknowledges that it filed the UCC-1 financing statements for each of the loans. Wells asserts that the purpose of the UCC-1 financing statements was to perfect Genesis's security interests in Progressive's collateral other than the insurance policies. Wells maintains that the UCC-1 financing statements achieved this goal. Wells states that "the sole purpose" for listing the life insurance policies in the UCC-1 financing statement for the fourth loan was for "alerting the world that these policies have been borrowed against." It "was not meant as a security device for the life insurance policies, as the securitization of the life insurance policies was effectuated by the Collateral Assignment of Contracts and the filing of collateral assignments (or carrier specific equivalents) with the respective insurance carriers" (emphasis omitted).
Wells's justification that he was simply putting the world on notice that the policies were borrowed against appears self-serving when viewed in a vacuum. However, Wells's factual averments are arguably consistent with Gilbride's interpretation of the Collateral Assignment of Contracts, emails and billing entries. Wells's explanation raises an issue of credibility that is not appropriately resolved on a motion for summary judgment (see Santos v Temco Serv. Indus., Inc., 295 AD2d 218 [1st Dept 2002]).
Nor is Gilbride's billing for the filing of the UCC-1 financing statements sufficient to support a conclusion that the law firm voluntarily assumed a duty. Supreme Court characterized the billings as for "policy collaterizations." However, this phrase is not used in the actual bills. Gilbride billed for the following: "[r]eview assignment of life policy and mortgage matters" (Sept. 15, 2009 bill entry); "[r]eview final assignments of collaterally assigned insurance policies; review final closing books" (bill entry for Feb. 8, 2011); "[r]eview assignments filed with carrier; compare to policies" (bill entry for Feb. 9, 2011). Gilbride also billed for reviewing and filing the UCC financing statements.
The billing entries note only that Gilbride reviewed the assignments. They do not state that Gilbride was going to file the assignments or perfect the security interests in the life insurance policies. The billing entries arguably relate to finalizing the loans and the items to be included in the closing binder. Moreover, amending the loan documents — and billing for the amendments — does not conclusively demonstrate that Gilbride assumed a duty to perfect the security interests in the loans.
In the light most favorable to Gilbride as the nonmoving party, the billing entries may be viewed as supporting the law firm's contention that it was retained only to prepare the loan documents, including the Collateral Assignment of Contracts and the closing binder.
Discovery and Gilbride's Counterclaims
Finally, we note that discovery in this case has not been completed. Gilbride has outstanding discovery requests, including discovery relating to issues of proximate cause. Under section 11(c) of the Collateral Assignments of Contracts, Progressive had 21 days to furnish [*4]proof of the assignments after the loan proceeds were released by Genesis to Progressive. Gilbride seeks discovery relating to what Progressive did with the loan proceeds during this 21-day period, as well as whether other creditors obtained priority within those 21 days. Supreme Court granted Genesis summary judgment during discovery proceedings, foreclosing Gilbride's attempt to obtain material and necessary discovery to its defenses.
Since we are reversing and denying summary judgment on liability for legal malpractice, we hold that the counterclaims for quantum meruit and account stated were improperly dismissed as well.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 11, 2018
CLERK