MUSA CALLISTRO, an Infant, by His Mother and Natural Guardian, JESSICA RIVERA, Appellant, v MICHAEL W. BEBBINGTON, M.D., et al., Respondents. [941 NYS2d 137]—

Judgment, Supreme Court, Bronx County (Howard H. Sherman, J.), entered December 7, 2009, dismissing the complaint, affirmed, without costs. Appeal from order, same court and Justice, entered June 24, 2009, which granted defendants' motion for summary judgment, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Plaintiff claims that defendants deviated from good and accepted medical practice by failing to perform a cesarean section during his birth on December 10, 2003, and that this failure caused him to sustain a hypoxic event, which is responsible for expressive and language deficits and a developmental disorder that were diagnosed when he was about 4½ years old.

The court granted defendants' motion for summary judgment

primarily on the ground that expert evidence disclosed that no hypoxic event occurred during plaintiff's birth and that plaintiff failed to raise a triable issue of fact because his main expert was unqualified to give an opinion, pursuant to the "locality rule" (*see Pike v Honsinger,* 155 NY 201, 209 [1898]).

We find that, while the locality rule may not apply here, defendants were correctly granted summary judgment because plaintiff did not raise factual issues as to either a departure or a resulting injury.

Defendants submitted the affirmation of Dr. Mary D'Alton, chairperson of the Department of Obstetrics and Gynecology at Columbia University-New York Presbyterian Hospital. Dr. D'Alton, basing her opinion on the medical records and testimonial evidence, a neurological evaluation of plaintiff in July 2008, and the complaint and bill of particulars, opined that defendants did not deviate from good and accepted medical practice, that no hypoxic incident occurred, and that no injury could be reasonably attributed to any act or omission by defendants.

Dr. D'Alton pointed to the postdelivery assessment of arterial and venous umbilical cord blood gases, both of which fell within normal limits. She also noted that plaintiff, whose delivery was complicated by shoulder dystocia and a nuchal cord, was discharged from the hospital three days after his birth, at which time he was "active, alert, voiding and stooling appropriately and feeding on demand." Dr. D'Alton concluded that the normal cord gas measurements and plaintiff's speedy discharge were "entirely inconsistent with an alleged hypoxic injury occurring during labor and delivery." Dr. D'Alton also averred that the fetal monitoring strips, which are in evidence, indicated that any variable decelerations were followed by quick recovery to baseline and that there was no indication of fetal distress.

With respect to the delivery and subsequent treatment, Dr. D'Alton found that defendants effectively managed the delivery complications, including both the shoulder dystocia and the nuchal cord. She noted that Dr. King successfully performed a procedure called a "Wood's screw maneuver" to address the dystocia and deliver the shoulder, and added that nuchal cords occur in about 25% of all births and have no bearing on whether to perform a cesarean delivery.

Dr. D'Alton also noted that the July 2008 neurological evaluation of plaintiff, who was then about four years and seven months old, was inconsistent with plaintiff's allegation that he suffers from "Pervasive Developmental Disorder." The examining physician, Dr. Regina R. DeCarlo, a pediatric neurologist,

did not detect any focal or motor neurological deficits. Dr. DeCarlo saw evidence of a developmental disorder of receptive and expressive language and a disorder of articulation, but found that plaintiff otherwise performed at the four-to-five-year level.

In opposition, plaintiff submitted affirmations from Dr. Bruce Halbridge, an obstetrician and gynecologist based in Texas, and Dr. Bruce Roseman, a pediatric neurologist practicing in White Plains, New York. Dr. Halbridge found various departures but limited his findings of causation to the following: He opined that once the mother was admitted on the morning of December 9, 2003 and defendants employed a fetal heart rate monitor, defendants should have abandoned their plan for a vaginal birth and instead delivered plaintiff by cesarean section. According to Dr. Halbridge, as of the morning of December 10, the fetal heart rate monitor had shown a "nonreassuring" pattern of late and variable decelerations. Dr. Halbridge contended that plaintiff was delivered in a hypoxic, "depressed" condition, and that, based on a December 11, 2003 sonogram, he had "possible small bilateral grade 1 subependymal hemorrhages."

Dr. Roseman's affirmation was based on his own examination of plaintiff in December 2008, just after plaintiff turned five. Like Dr. DeCarlo, Dr. Roseman detected speech and language deficits and an articulation disorder. He stated that he agreed with Dr. Halbridge's opinion about the etiology of plaintiff's injuries, and opined that "[t]here is nothing in the child's medical history, other than the abnormal labor and delivery, that would account for his deficits in speech and language."

Contrary to the dissent's contention, neither Dr. Halbridge's nor Dr. Roseman's opinion raises a triable issue as to causation, since each fails to address how the claimed departures could have caused the claimed cognitive delays. Dr. Halbridge failed to rebut Dr. D'Alton's key assertion that the normal values for plaintiff's umbilical cord gas were "entirely inconsistent" with hypoxic injury. Dr. Halbridge did not dispute Dr. D'Alton's opinion that the gas test results completely ruled out hypoxia or the fact that the hospital record attributes the first (low) Apgar score to the nuchal cord. Rather, he ambiguously stated that "loss of beat to beat variability coupled with late decelerations . . . enhance[ ] the likelihood that the fetus is undergoing significant hypoxia" (emphasis supplied) and that "[t]his occurred in the present case, notwithstanding the normal umbilical cord blood gas values that were obtained." Dr. Halbridge's statement amounted to bare conjecture, which lacks the "reasonable degree of medical certainty" required in an expert affidavit in a

medical malpractice case (*see Burgos v Rateb*, 64 AD3d 530, 530 [2009]). Moreover, Dr. Halbridge ignored Dr. D'Alton's further point that plaintiff's discharge three days after his birth disproved his claimed injury. Finally, Dr. Halbridge did not explain how the December 11 neurosonogram, which indicated "possible" hemorrhages, could show that the plaintiff suffered permanent brain damage, as Dr. Roseman concluded, since a follow-up neurosonogram performed one month later showed no evidence of hemorrhaging.

Dr. Roseman opined in conclusory fashion that the hypoxic-ischemic stress and other trauma that occurred during the delivery resulted in permanent brain damage, primarily to the neocortex, which in turn caused plaintiff's speech and language disorder. However, Dr. Roseman failed to support this opinion with a radiological study of plaintiff's brain or any other medical record demonstrating brain damage other than language delay. Dr. Roseman's assertions that "[t]here is nothing in [plaintiff's] medical history, other than the abnormal labor and delivery, that would account for his deficits in speech and language" and that the deficits resulted from his permanent brain damage are entirely conclusory. In fact, the record shows that plaintiff's cousins suffer from similar language deficits.

As a final matter, summary judgment should have been granted to defendant Dr. Michael Bebbington for the separate reason that he was not involved in caring for or treating plaintiff. Concur—Tom, J.P., Friedman, Freedman, and Richter, JJ.

Manzanet-Daniels, J., dissents in part in a memorandum as follows: I agree with the majority that in rejecting Dr. Halbridge's affirmation, the motion court misapplied the "locality rule."[1] I would find, however, that plaintiff, through the expert affirmations of obstetrician-gynecologist Dr. Halbridge and pediatric neurologist Dr. Roseman, raised a triable issue of fact as to whether defendants' deviations from good and accepted medical practice caused his neurological deficits.

Plaintiff's obstetrical expert opined that during plaintiff's mother's near 24-hour labor, plaintiff experienced multiple late decelerations indicative of placental insufficiency causing fetal

---

**1.** It cannot be denied that national standards of care have reduced local variations in standards of care, eroding the justification for the locality rule announced by the Court in *Pike v Honsinger* (155 NY 201 [1898]), in 1898. In any event, our sister courts have agreed that where a medical expert proposes to testify about minimum standards of care applicable throughout the United States, the locality rule is not implicated (*see McCullough v University of Rochester Strong Mem. Hosp.*, 17 AD3d 1063 [4th Dept 2005]).

hypoxia.[2] He opined that it was a departure for staff to deliver plaintiff vaginally with Pitocin augmentation under these circumstances. He explained that diminished beat-to-beat heart rate variability, coupled with late decelerations, enhances the likelihood that the fetus is experiencing significant hypoxia. Plaintiff's expert examined the fetal heart monitoring strips in great detail and opined that by 11:52 P.M. on December 10, 2003, at the latest, prompt delivery was essential to prevent further hypoxic-ischemic insult. Plaintiff's expert opined that plaintiff was delivered in a depressed condition as a result of central nervous system insult, noting that an ultrasound performed on the first day of life was positive for possible grade I subependymal hemorrhages. It is undisputed that plaintiff presented with shoulder dystocia and the umbilical cord wrapped around the neck. His Apgar score immediately after birth was four out of a possible 10 (two for heart rate, one for tone, and one for reflex irritability, with zero scores for respiratory effort and color), and seven at four minutes (respiration and color improved), after resuscitation with oxygen by bag and mask.

Plaintiff's pediatric neurologist noted that in addition to plaintiff's initial hypotonic, or "floppy" state, there was facial bruising, cephalohematoma, abdominal petechiae and separated sutures, all indicative of a traumatic delivery in addition to a period of hypoxia-ischemia.

The very neurological report relied on by defendants in moving for summary judgment indicates that plaintiff suffers from a developmental disorder of receptive and expressive language development, that he has a disorder of articulation, and that he is fidgety, with a short attention span. Although at the time of the examination, plaintiff was $4^{1}/_{2}$ years old, he was unable to count to 10 consistently or to sing the alphabet song. Plaintiff's pediatric neurologist notes that there is nothing else in plaintiff's medical history, apart from the abnormal labor and delivery, which would account for these deficits in speech and language. The nature of these deficits is such that they would not be immediately apparent, but would manifest at a later stage of development. I would accordingly find that plaintiff has sufficiently raised a triable issue of fact concerning defendants' departures from accepted practice and causation. The conflict between the opinions of both sides' experts is one for a jury to resolve (see Cregan v Sachs, 65 AD3d 101, 109 [2009]).

---

**2.** Plaintiff's expert opined that repetitive late decelerations (i.e., one that begins after a contraction starts but reaches a peak well after the peak of contraction is reached and does not return to baseline until 30 to 60 seconds after the contraction is completed), particularly those marked by a prolonged return to baseline, signify a hypoxic state when they persist.

I agree, however, that the complaint was correctly dismissed as against defendant Dr. Bebbington, since the record does not reflect that he was involved in plaintiff's care or treatment.[3]

**3.** Dr. King, the Fellow in Maternal Fetal Medicine on call at the hospital, delivered plaintiff.