■ Francisca Montilla, as Administratrix of the Estate of Maria Almonte, Deceased, Appellant, v St. Luke's-Roosevelt Hospital et al., Respondents. [46 NYS3d 93]—

Appeal from order, Supreme Court, New York County (Joan B. Lobis, J.), entered July 20, 2015, which granted defendants' motion for summary judgment dismissing the complaint, deemed an appeal from judgment, same court and Justice, entered September 16, 2015, dismissing the complaint (CPLR 5501 [c]), and so considered, said judgment unanimously affirmed, without costs.

On August 14, 2009, plaintiff's decedent, a 66-year-old woman, presented to defendant St. Luke's-Roosevelt Hospital with a history of diabetes and hypertension, and a chief complaint of altered mental status. Upon admission, decedent underwent an initial "Fall Risk Assessment," which placed her in the moderate risk category. Decedent's blood pressure was 175/93 in the emergency room, and 160/75 when retested in the afternoon. On the same day decedent was admitted, hospital personnel performed an initial head CT scan; that

study showed no intracranial hemorrhage and no changes since an MRI performed on May 30, 2009.

On August 15, 2009, decedent's blood pressure measured 120/80, and then increased to 150/90 on August 16. On August 17, decedent's blood pressure measured 144/82.

At about 7:45 a.m. on August 18, 2009, four days after her admission date, decedent complained of epigastric pain and vomiting. The nurse's progress notes indicated that decedent was found to be lethargic, a change from the previous day, and her blood pressure measured 130/70. By 9:00 a.m., decedent's blood pressure had risen to 178/80.*

Later that day, at about 10:20 a.m., a nurse found decedent on the floor of her room. A report noted that decedent was "lethargic" and "not answering questions." At about 11:00 a.m., decedent vomited, and at 11:20 a.m., her blood pressure was 160/90. A post-fall assessment form indicated that decedent was receiving Heparin, an anticoagulation medication. Decedent had another CT study performed at about 1:30 p.m., and it showed an intraventricular hemorrhage—that is, bleeding within the ventricle, one of the spinal fluid-filled cavities of the brain. This hemorrhage had not appeared on the CT scan performed four days earlier.

The hospital later transferred decedent to Roosevelt Neurosurgery ICU, and decedent died on October 8, 2009. Plaintiff commenced this action, alleging, among other things, that the hospital negligently failed to prevent decedent from falling.

Defendants moved for summary judgment. On the motion, defendants submitted the expert affidavit of a neurosurgeon, who reviewed three CT scans, performed May 30, 2009; August 14, 2009; and August 18, 2009. Defendants' expert opined that the August 18, 2009 head CT study showed a new intraventricular hemorrhage; based on his review of the CT scans, defendants' expert opined that the hemorrhage did not result from a fall. Further, the hospital chart reviewed by defendants' expert indicated that the nursing staff found decedent on the floor; the chart contained no documentation that decedent was bleeding or had suffered any external injury as a result of a fall.

Defendants' expert explained that intraventricular brain hemorrhaging can, in fact, result from head trauma suffered in a fall. He opined, however, that the pattern of injury revealed

---

\* The nurse's handwritten progress notes record decedent's blood pressure on the morning of the 18th, before her fall, at 170/80, while the hospital's printed records show 178/100 at 9:00 a.m. on the 18th.

on decedent's August 18 CT films was inconsistent with an injury from a fall or other head trauma, as one would not see an isolated intraventricular bleed resulting from head trauma without seeing accompanying evidence of global injury, such as skull fracture or brain contusion, on the CT study.

Defendants' expert further opined that chronic elevated blood pressure eventually weakens the delicate walls of the blood vessels in the brain tissue abutting the ventricles; the vessels cannot withstand a sudden spike in blood pressure, and therefore are prone to rupture. Observing that decedent had a long-standing history of high blood pressure, and that her blood pressure was elevated just prior to the events at issue, the expert concluded that decedent's hemorrhage was consistent with bleeding resulting from her persistent acute hypertension.

In opposition, plaintiff proffered a redacted expert affirmation from a board-certified neurologist, who opined that while "prolonged hypertensive crisis" was a "potential cause" of intraventricular hemorrhage, head trauma was also a "well-known and accepted cause of intraventricular hemorrhage," and indeed, had been reported in medical literature since the advent of CT scan technology. Plaintiff's expert further noted that, because the intraventricular hemorrhage was first apparent after decedent fell and hit her head, it was more likely than not that the fall was the proximate cause of her intraventricular bleeding.

The expert further noted that decedent's blood pressure was elevated, but did "not give rise to a hypertensive crisis," as a hypertensive crisis is "typically" evidenced by blood pressures "in excess of 180/100." Nor did decedent's blood pressure readings from August 15 to August 18, 2009 suggest that she was experiencing a hypertensive crisis or that her hypertension was worsening. Plaintiff's expert opined that, based on decedent's blood pressure readings, decedent's hypertension improved during the admission and was normal, and she was not in a hypertensive crisis; indeed, plaintiff's expert noted, the hospital had been planning to discharge decedent. Furthermore, the expert noted that on August 18, 2009, the day of her fall, decedent had been taking Heparin, a drug that increases a patient's risk of bleeding following trauma. Therefore, plaintiff's expert opined, it was "more likely than not" that decedent's intraventricular hemorrhage was caused by her fall rather than by hypertension.

The motion court granted defendants' motion and dismissed the complaint. In so doing, the court found that defendants

established their prima facie case, since they showed that decedent had a history of hypertension and had high blood pressure before the intraventricular hemorrhage; and that the pattern of the bleed depicted on the films was inconsistent with an injury from a fall or head trauma. Plaintiff, the court found, failed to rebut this showing. Although the court noted the parties' experts' disagreement as to the cause of the intraventricular hemorrhage, it found that plaintiff's expert opinion was not "detailed, specific and factual." Rather, the expert discussed what could, "in theory," cause a hemorrhage. However, the expert failed to present facts supporting the statement that decedent hit a specific part of her head, or demonstrate that there was any trauma in general.

As the motion court accurately noted, defendants made a prima facie showing that plaintiff's decedent did not sustain an intraventricular hemorrhage as a result of a fall at the hospital (*see generally Scalisi v Oberlander*, 96 AD3d 106, 120 [1st Dept 2012]). In opposition, plaintiff failed to raise a triable issue of fact, as her expert never addressed the assertion by defendants' expert that there was no radiological evidence of trauma (*see Fernandez v Moskowitz*, 85 AD3d 566, 567-568 [1st Dept 2011]; *see also Callistro v Bebbington*, 94 AD3d 408, 410-411 [1st Dept 2012], *affd* 20 NY3d 945 [2012]).

Further, plaintiff's expert omitted facts regarding the rise in decedent's blood pressure just before her fall, thus failing to base his opinion on all relevant record evidence; this deficiency renders the opinion insufficient (*see Callistro*, 94 AD3d at 410-411). While plaintiff's expert posited that trauma to the front or lateral aspect of the head could cause the bleeding observed, the expert failed to adduce any evidence as to what, if any, portion of decedent's head was actually struck. Accordingly, the opinion is too speculative to raise an issue of fact (*see Foster-Sturrup v Long*, 95 AD3d 726, 728 [1st Dept 2012]). Moreover, plaintiff's expert's conclusion that the location of the bleed suggested head trauma was based on hindsight reasoning—that is, the expert used the injury itself as a basis to assume that certain conditions must have existed at the time of the injury. This reasoning is insufficient to defeat summary judgment (*Kristal R. v Nichter*, 115 AD3d 409, 412 [1st Dept 2014]; *Brown v Bauman*, 42 AD3d 390, 392 [1st Dept 2007]). Concur—Renwick, J.P., Moskowitz, Kapnick, Kahn and Gesmer, JJ.