[54 NYS3d 398]

Sarah Adams et al., Respondents, v Juan J. Pilarte, M.D., et al., Defendants, and Montefiore Medical Center, Appellant.

First Department, June 15, 2017

### APPEARANCES OF COUNSEL

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, New York City (*Judy C. Selmeci* of counsel), for appellant.

*Rheingold Giuffra Ruffo & Plotkin LLP*, New York City (*Sherri L. Plotkin* and *Thomas P. Giuffra* of counsel), for respondents.

### OPINION OF THE COURT

MANZANET-DANIELS, J.

The 17-year-old plaintiff received contraceptive counseling from a nurse practitioner at a school clinic operated by defendant Montefiore Medical Center. Plaintiff was noted as having a family history of heart disease and a chronic heart murmur.[1]

---

1. Plaintiff was under the care of a pediatric cardiologist because of the family history of heart disease. Plaintiff's mother and uncle both suffered from ventricular dysplasia. Plaintiff's pediatric cardiologist found no evidence of ventricular dysplasia in plaintiff at a March 2009 visit.

In April 2010, plaintiff was dispensed a contraceptive device known as a NuvaRing, a hormonal method associated with an increased risk of developing blood clots. The device is inserted internally by the patient every month. The nurse practitioner testified that it was her custom and practice to review the information contained on the NuvaRing fact sheet/consent form with the patient prior to dispensing the device. The Montefiore school clinic records for plaintiff do not include a copy of the form, either signed or unsigned; however, plaintiff's mother admitted that she was aware of the risk of blood clots and had discussed same with her daughter.

On June 1, 2010, plaintiff presented at the school clinic complaining of shortness of breath and chest pain. The nurse practitioner's notes indicated "hx [history] of heart problem." She did not document an examination or evaluation of plaintiff's heart and lungs. The nurse practitioner did not consider the NuvaRing as a precipitating factor of the patient's symptoms, and assessed plaintiff as being dehydrated.

Plaintiff saw her pediatrician later that same day. He diagnosed her with asthma, though plaintiff had no prior history of asthma and did not have any wheezing upon examination.

On June 2, 2010, plaintiff presented to the emergency room at Bronx Lebanon Hospital complaining of chest pain and intermittent palpitations. The triage notes clearly noted that plaintiff was using the NuvaRing device. An EKG was performed and found to be normal with a prolonged QT interval. Plaintiff was discharged without being assessed for possible thromboembolism.

On June 3, 2010, plaintiff returned to the pediatrician's office continuing to complain of chest pain. The pain was persistent without relation to exertion. The pediatrician noted that her chest pain might be related to costochondral pain. He instructed her to return in 48 to 72 hours if her symptoms did not improve.

On June 4, 2010, a Friday, a doctor from Bronx Lebanon called plaintiff's mother to report "abnormalities" she had seen on the EKGs taken during plaintiff's emergency room visit, and recommended that she make an appointment with plaintiff's pediatric cardiologist. Plaintiff's mother called the pediatric cardiologist's office, but was informed that the office needed to see the hospital records before scheduling an appointment. The hospital promised to fax the records first thing

on Monday morning, June 7, 2010. An appointment was scheduled for plaintiff to see the pediatric cardiologist on June 10, 2010.

On June 8, 2010, plaintiff complained of chest pain and collapsed at home. Plaintiff's mother began CPR and called EMS. EMTs shocked plaintiff three times and administered epinephrine and vasopressin. The total cardiac arrest time was noted to be eight minutes.

Upon arrival at the hospital, plaintiff was nonresponsive and had no pupillary reflex. Her score on the Glasgow coma score was three, the lowest possible score. While in the emergency room, plaintiff showed evidence of seizure activity. She was placed on a ventilator and transferred to the pediatric intensive care unit at Columbia Presbyterian Hospital. Upon arrival, an echocardiogram showed severely diminished right ventricular function and a dilated main pulmonary artery. A CT scan was positive for bilateral pulmonary emboli. An MRI of the brain showed bilateral infarcts and subacute ischemic changes in the hippocampal region. Plaintiff remained hospitalized for a month, and was thereafter transferred to the NYU Rusk Institute for rehabilitation. As a consequence of the arrest, she has suffered significant and permanent brain damage with marked cognitive and fine motor skills deficits, and requires constant, around-the-clock care.

Defendant Montefiore moved for summary judgment, asserting that it did not depart from accepted standards of medical care and that any such departure in failing to properly assess and respond to the patient's forming pulmonary embolism was not the proximate cause of her injuries (*see Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]). Montefiore relied on the expert affidavit of Dr. Lisa Bardack, a board-certified internist. Dr. Bardack opined, based on her review of the medical records, that there was no indication to work up plaintiff for thrombophilia. She opined that plaintiff's family history of heart disease did not contraindicate prescribing NuvaRing, and that the NuvaRing fact sheet clearly discussed the warning signs and serious health problems associated with the contraceptive method, allowing users to make an informed choice. She opined that no reasonable or additional follow-up medical care could have been recommended by the nurse practitioner that was not provided by the higher level of care providers to which plaintiff subsequently presented, and that no care rendered by the clinic's nurse practitioner affected plaintiff's outcome.

In opposition, plaintiff relied on the affirmation of Dr. Melanie Gold, a physician board-certified in pediatrics and adolescent medicine who had experience working in school medical clinics. Dr. Gold identified the following as departures from accepted medical practice: the failure to have plaintiff patient sign the consent form and the failure to retain a copy; the failure to document that plaintiff was counseled regarding the serious side effects associated with the use of the NuvaRing and the importance of immediately removing the device in the event she experienced such symptoms; and the failure to properly evaluate plaintiff or to immediately remove the device when plaintiff presented to the clinic complaining of chest pain and shortness of breath. Dr. Gold opined that if the nurse practitioner had properly assessed plaintiff, removed the NuvaRing, and referred plaintiff for further assessment, all of the subsequent injuries and complications suffered by plaintiff would have been avoided.

In reply, Montefiore relied on a second affidavit from Dr. Bardack. Dr. Bardack took issue with Dr. Gold's opinion that removal of the NuvaRing on June 1, 2010 would have affected the outcome. She opined that "[t]he gradual decrease of clot risk from removal . . . would have no impact . . . as [plaintiff's] pulmonary embolism occurred on June 8, 2010, some 7 days after being seen at [the clinic]," relying on FDA prescribing information guidelines which recommended that the NuvaRing be discontinued four weeks prior to any surgery.

The court denied Montefiore's motion for summary judgment, finding sufficient questions of fact based on the expert opinions.

On appeal, Montefiore argues that any departures from accepted practice were not a proximate cause of patient's injuries because they did not affect—and, indeed, could not have affected—the outcome.

■ Montefiore made a prima facie case through its expert, Dr. Bardack, that it was not the proximate cause of plaintiff's injuries (see Frye, 70 AD3d at 24). In opposition, plaintiff's expert raised an issue of fact concerning causation. We disagree with the dissent that the affidavit of Dr. Gold was speculative and conclusory. Dr. Gold specifically opined that if the nurse practitioner had properly assessed plaintiff, instructed her to remove the NuvaRing, and referred her for further assessment, plaintiff's subsequent injuries and complications would have been avoided. Had the nurse properly assessed plaintiff as suffering from the symptoms of a blood

clot, she could have instructed plaintiff to remove the ring immediately, thereby at least beginning to correct any clotting imbalance. As Montefiore's expert acknowledges, "clot risk is gradually decreased after the ring is removed." Thus, while the nurse was not in a position to treat clots, she certainly was in a position to make the diagnosis and to direct the plaintiff to remove the likely source of her symptoms, lessening the risk of an adverse outcome.

Montefiore asserts that even if the NuvaRing had been removed on June 1, thromboembolism was nonetheless likely to ensue, relying on FDA guidelines concerning presurgical protocols;[2] Dr. Gold, however, opined that the risk of blood clotting would have subsided had the ring been removed. At this stage, plaintiff's expert's affidavit suffices to raise a factual issue as to the element of causation.

It may well be that the medical professionals who subsequently treated plaintiff are also at fault for failing to work her up for thromboembolism and failing to remove or direct her to remove the NuvaRing. Issues of relative culpability await resolution at trial. Plaintiff's submissions raise an issue of fact as to the liability of the nurse practitioner sufficient to defeat summary judgment.

■ However, Montefiore is entitled to dismissal of plaintiffs' informed consent claim. This claim was raised before the motion court, and therefore the matter is properly before us. The record shows that the nurse practitioner disclosed and discussed the potential risks of the NuvaRing with the patient, including the risk of blood clots. In fact, plaintiff's mother testified at her deposition that she received an information sheet about the device, which she discussed with her daughter, as well as signed the consent form at the bottom of the sheet. There is accordingly no evidence in the record sufficient to raise a triable issue of fact as to whether the doctor failed to disclose a reasonably foreseeable risk (*Orphan v Pilnik*, 66 AD3d 543, 544 [1st Dept 2009], *affd* 15 NY3d 907 [2010]), nor do plaintiffs raise any substantive arguments in support of their informed consent claim.

Accordingly, the order of the Supreme Court, Bronx County (Douglas E. McKeon, J.), entered August 19, 2016, which, to

---

2. Dr. Bardack's opinions concerning the import of the FDA guidelines are contained in her reply affidavit, to which plaintiff had no opportunity to respond.

the extent appealed from as limited by the briefs, denied Montefiore's motion for summary judgment dismissing the complaint as against it, should be modified, on the law, to dismiss the second cause of action alleging lack of informed consent as against Montefiore, and otherwise affirmed, without costs.

ANDRIAS, J. (dissenting in part). On June 8, 2010, plaintiff, Sarah Adams, suffered a bilateral pulmonary embolism, allegedly caused by the use of the NuvaRing, a hormonal contraceptive device that carries an increased risk of developing blood clots. Plaintiff alleges that defendant Montefiore Medical Center failed to obtain her informed consent when it dispensed the NuvaRing and that it committed malpractice when it failed to properly diagnose and treat complications associated with its use at a June 1, 2010 visit, which was a proximate cause of her injuries.

Supreme Court denied Montefiore's motion for summary judgment dismissing the complaint as against it. The majority modifies to dismiss the cause of action for lack of informed consent, and otherwise affirms, finding that, in opposition to Montefiore's prima facie showing, plaintiff's expert raised an issue of fact as to whether Montefiore's alleged departures were a proximate cause of plaintiff's injuries. Because I believe that plaintiff's expert offered only conclusory assertions and speculation that the injuries plaintiff suffered would have been avoided had Montefiore referred her for further assessment or removed the NuvaRing at the June 1, 2010 visit, I dissent in part.

On April 12, 2010, the clinic at her high school, operated by Montefiore, dispensed the NuvaRing to plaintiff, then age 17. On May 10, plaintiff returned to the clinic for a follow-up visit. The records for that visit are silent as to whether plaintiff had inserted the NuvaRing or had removed it according to the instructions or whether she was experiencing side effects. On May 17, complaining of a rash for five days and headaches, plaintiff saw defendant Dr. Pilarte, her pediatrician, whose diagnosis was Pityriasis Rosea.

On June 1, 2010, plaintiff went to the Montefiore clinic, complaining of shortness of breath and chest pain. The nurse practitioner who assessed plaintiff noted that plaintiff complained of feeling tired and had told the nurse that she had been active over the weekend, but had not drunk water. She also noted that plaintiff complained of a dry mouth and had a

"hx [history] of heart problem." Plaintiff's vital signs were temperature of 97.9 degrees, heart rate of 76, respiration rate of 16 and blood pressure of 90/60. Her oxygen saturation was 99%. The nurse practitioner diagnosed plaintiff with dehydration and did not consider the NuvaRing as a precipitating factor of her symptoms.

Later that day, plaintiff returned to Dr. Pilarte with the same complaints. Dr. Pilarte diagnosed her with unspecified asthma, possible exercise induced asthma, and prescribed an inhaler, despite plaintiff not having a prior history of asthma.

On June 2, 2010, plaintiff went to the emergency room at defendant Bronx Lebanon Hospital Center, complaining of chest pain, shortness of breath and heart palpitation. The hospital's notes indicate that plaintiff was using the NuvaRing. Her EKG and vital signs were found to be normal and she was discharged without assessment for possible thromboembolism.

On June 3, 2010, plaintiff returned to Dr. Pilarte and again complained of chest pain, shortness of breath and heart palpitation. Her respiratory rate was elevated. Dr. Pilarte noted that her chest pain might be related to costochondral pain and told plaintiff to return in 48 to 72 hours if there was no improvement. Plaintiff's mother, Yanixa Rosado, testified that she asked for a written referral to the pediatric cardiologist at Colombia Presbyterian but Dr. Pilarte refused. Dr. Pilarte testified that he gave a verbal recommendation that plaintiff see a cardiologist at Lincoln Hospital because she could be seen faster there.

On June 4, 2010, Dr. Kulkarny of Bronx Lebanon advised plaintiff's mother of abnormalities on the June 2 EKGs and urged her to make an appointment with plaintiff's pediatric cardiologist as soon as possible. The mother called the cardiologist's office and was told that they needed the medical records before scheduling an appointment. While an appointment was subsequently scheduled for June 10, plaintiff collapsed at home on June 8. Plaintiff was in cardiac arrest for eight minutes and sent to Bronx Lebanon, where she arrived unresponsive with nonreactive pupils and no response to painful stimuli. She was transferred to Colombia Presbyterian Pediatric Intensive Care Unit where a CT scan was positive for bilateral pulmonary emboli and an MRI of the brain showed bilateral thalamic infarcts.

In moving for summary judgment dismissing a complaint alleging medical malpractice, a defendant must establish, prima

facie, either that there was no departure from good and accepted medical practice or that any departure was not a proximate cause of the plaintiff's injuries (*see Scalisi v Oberlander*, 96 AD3d 106, 120 [1st Dept 2012]). If the defendant meets its burden, the plaintiff, to avoid summary judgment, must rebut the defendant's prima facie showing via medical evidence attesting that the defendant departed from accepted medical practice and that such departure was a proximate cause of the injuries alleged (*see Agosto v Nercessian*, 124 AD3d 562, 564 [1st Dept 2015]).

As the majority finds, Montefiore, through its expert, made a prima facie showing that any departure from the accepted standard of medical care in failing to properly assess and respond to plaintiff's forming pulmonary embolism was not a proximate cause of her injuries. Montefiore's expert opined to a reasonable degree of medical certainty that plaintiff was properly evaluated and that there was no indication to work plaintiff up for thrombophilia on June 1, and that there would have been no change in plaintiff's outcome had the clinic worked plaintiff up for thrombophilia that day. The expert explained that any failure to refer plaintiff for a higher level intervention was inconsequential, as in the days immediately following her visit to the clinic, plaintiff saw her pediatrician twice, as well as emergency room doctors, who observed her symptoms and were aware that she was using the NuvaRing. The expert stated that this amounted to complete follow-up care and that there was no reasonable or additional follow-up care which the clinic could have recommended.

In opposition, plaintiff's expert stated, among other things, that

> "it is my opinion to a reasonable degree of medical certainty that if [the nurse practitioner at the Montefiore clinic] had not departed from the good and accepted standards of medical care and practice by properly assessing the situation and removing the NuvaRing and referring Sarah for further assessment at the June 1, 2010 visit, all of the subsequent injuries and complications suffered by Sarah would have been avoided."

The majority believes that this suffices to raise an issue of fact as to causation and that while other medical professionals who subsequently treated plaintiff may also be at fault, issues of relative culpability should await resolution at trial. Under the particular circumstances of this case, I disagree.

Generally, "the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants" (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002] [internal quotation marks omitted]). However, a plaintiff's expert's opinion "must demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered" (*Dallas-Stephenson v Waisman*, 39 AD3d 303, 307 [1st Dept 2007] [internal quotation marks omitted]). If "the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz*, 99 NY2d at 544; *Giampa v Marvin L. Shelton, M.D., P.C.*, 67 AD3d 439 [1st Dept 2009]). Further, the plaintiff's expert must address the specific assertions of the defendant's expert with respect to negligence and causation (*see Foster-Sturrup v Long*, 95 AD3d 726, 728-729 [1st Dept 2012]).

Here, plaintiffs' expert's assertion that the failure to remove the NuvaRing on June 1, 2010 "may have led to this devastating outcome" is both conclusory and speculative (*see Bullard v St. Barnabas Hosp.*, 27 AD3d 206 [1st Dept 2006] [defendants were entitled to summary judgment where plaintiff's opposition to their prima facie showing of entitlement to summary judgment offered only conclusory assertions and speculation that an earlier diagnosis and treatment of the heel decubitus would have avoided the eventual bilateral amputation]). The expert failed to show that even if an imbalance in clotting existed on June 1, it would have resolved itself before June 8 if the NuvaRing had been removed that day, and failed to establish how the removal of the NuvaRing that day would have prevented plaintiff's pulmonary embolism (*see Matter of Joseph v City of New York*, 74 AD3d 440 [1st Dept 2010]).

The majority disagrees, stating that "[h]ad the nurse properly assessed plaintiff as suffering from the symptoms of a blood clot, she could have instructed plaintiff to remove the ring immediately, thereby at least beginning to correct any clotting imbalance" (majority op at —). While the majority posits that this may have lessened the risk of an adverse outcome, it has not been established that plaintiff's blood clots had in fact formed by the time of her last visit to the clinic on June 1. In any event Montefiore's expert opined that, given the timing between that visit and her cardiac arrest on June 8,

2010, removal of the NuvaRing on June 1 would not have prevented her subsequent injuries because not enough time would have elapsed to allow for the clotting risk to decrease. In support, Montefiore's expert explained that the prescribing information from the Federal Drug Administration for Nuva-Ring, addressing discontinuance of the medication for surgical patients, states that the medication/device is to be discontinued four weeks prior to a surgical procedure and the patient is to remain off NuvaRing for two weeks thereafter for clot risk reduction, which suggests that "NuvaRing would have to be discontinued for weeks to allow the risk of clot to diminish." The expert also noted that the "prescribing information for NuvaRing states clot risk is gradually decreased after the ring is removed."

As Montefiore's expert observed, plaintiff's expert's "statement calling for immediate removal of NuvaRing and an effect on the outcome does not consider the FDA's prescribing information and literature concerning the product," and is speculative. Moreover, the opinion had multiple qualifiers, with plaintiff's expert stating that it was "likely" that a clot was forming on June 1, given plaintiff's symptoms, and that the failure to remove the NuvaRing "may" have led to the outcome here. Plaintiff's expert similarly speculated that "if" a pulmonary embolism was forming and plaintiff referred to a "higher level of assessment" "in a more timely manner," then "many, if not all" of the "most severe" events "would have been avoided." However, plaintiff's vitals were normal on June 1 and she only complained of shortness of breath on exertion. The theory that plaintiff was already suffering from a blood clot when she visited the clinic that day is based on supposition and hindsight, and is therefore insufficient to raise a material issue of fact (*see Manuel H. v Landsberger*, 138 AD3d 490 [1st Dept 2016], *lv denied* 28 NY3d 909 [2016]; *Foster-Sturrup*, 95 AD3d at 728).

Furthermore, even if the clinic had made a different diagnosis, it could only have referred plaintiff elsewhere. It could not treat her for clots. Plaintiff's expert did not refute Montefiore's showing that, even had a referral been given, the result would have been the same because plaintiff was nevertheless seen by numerous health care providers, including her regular pediatrician, who were advised of her complaints and the fact that she was using the NuvaRing. Disregarding these subsequent examinations, the first of which occurred on the very same day

as plaintiff's last visit to the clinic, plaintiff's expert merely speculated that Montefiore's failure to properly refer her for a "higher level" of intervention and assessment was a proximate cause of her injuries. This did not suffice to establish the requisite nexus between the alleged departure and plaintiff's injuries, and Montefiore is entitled to dismissal of plaintiff's medical malpractice claims because a rational jury could not infer that there was a substantial possibility that plaintiff was denied a chance of the better outcome as a result of Montefiore's alleged deviation from the standard of care (*see Moore v New York Med. Group, P.C.*, 44 AD3d 393 [1st Dept 2007], *lv dismissed* 10 NY3d 740 [2008]; *DeCintio v Lawrence Hosp.*, 25 AD3d 320 [1st Dept 2006]).

Accordingly, the order denying Montefiore's motion for summary judgment dismissing the complaint as against it should be reversed and Montefiore's motion for summary judgment granted in its entirety.

MAZZARELLI and WEBBER, JJ., concur with MANZANET-DANIELS, J.; TOM, J.P. and ANDRIAS, J., dissent in part in a separate opinion by ANDRIAS, J.

Order, Supreme Court, Bronx County, entered August 19, 2016, modified, on the law, to dismiss the second cause of action alleging lack of informed consent as against Montefiore, and otherwise affirmed, without costs.