(October 24, 2017)

■ TARA KEATING BROOKS et al., Respondents, v ROBERT S. APRIL, M.D., et al., Appellants. [63 NYS3d 331]—

Order, Supreme Court, New York County (Joan B. Lobis, J.), entered on or about July 11, 2016, which, inter alia, denied defendants' motion for summary judgment dismissing the complaint in its entirety, reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.

On October 23, 2010, plaintiff Tara Keating Brooks sustained a head injury after having fallen while playing catch with a family member. On November 2, 2010, she visited defendant Dr. Robert S. April, a neurologist at Mount Sinai Hospital, for the first time, complaining of headaches. Dr. April ordered a CT scan of plaintiff, which took place that day. The results of the CT scan were unremarkable. Dr. April's diagnosis was that plaintiff was suffering from post-concussion headache syndrome. Dr. April conducted follow-up examinations of plaintiff on November 8 and November 15, 2010, and concluded that plaintiff was continuing to suffer from post-concussion headache syndrome. On November 30, 2010, the day that plaintiff experienced what later proved to be a cerebral hemorrhage, plaintiff called Dr. April, complaining that her head pain had increased. Dr. April advised plaintiff to rest, take pain medication and to come to his office the following morning. Plaintiff made no further attempt to seek medical assistance or contact any other medical professionals that evening.

The following day, plaintiff's headache pain had diminished somewhat, but she was still experiencing vision problems. Dr. April's examination of her that day indicated that she was alert and oriented, her reflexes were normal, with no Babinski sign, and her blood pressure and pulse rate were normal. He performed an electroencephalogram (EEG), with normal results. Dr. April administered a nonsteroidal anti-inflammatory anti-migraine medication in the office, after which plaintiff's headache was somewhat further relieved. He diagnosed her as having experienced a migraine, based upon her symptoms, his examination that day, his earlier CT scan with normal results, the EEG, which showed no signs of abnormality or brain dysfunction, and her personal and family medical history of migraine headaches. After December 1, 2010, plaintiff sought no further treatment from Dr. April.

On December 2, 2010, plaintiff visited another neurologist, Dr. Paul-Henry Cesar of Columbia University Medical Center, for a second opinion. Upon examining plaintiff, Dr. Cesar formulated a working diagnosis, paralleling that of Dr. April, that plaintiff suffered from a migraine with aura and post-concussive headache syndrome, but he ordered an MRI of plaintiff's brain in order to evaluate secondary causes of plaintiff's headache. The MRI, done on December 7, 2010, showed a large amount of blood products in the left parietal lobe of plaintiff's brain, which was indicative of a brain bleed, but not of a micro-arteriovenous malformation (micro-AVM). The following morning, December 8, 2010, Dr. Cesar informed plaintiff of the results of the MRI and referred her to a neurosurgeon.

On December 9, 2010, plaintiff visited Dr. Guy McKhann of Columbia University Medical Center. Dr. McKhann ordered a CT scan that same day, which showed plaintiff's brain hemorrhage. Dr. McKhann stated that the hemorrhage had likely occurred nine days prior to her visit, when her acute new symptoms developed. He recommended that plaintiff undergo another MRI, an MRA (magnetic resonance angiogram) and an MRV (magnetic resonance venogram). He added that if plaintiff had an AVM, a cerebral angiogram would be needed, but he did not refer her for that test (an invasive procedure subjecting the patient to possible stroke, loss of use of limbs due to the development of clots, renal failure, allergic reaction and even death), preferring to await the results of the MRI. On December 10, 2010, plaintiff underwent an MRI, MRA and MRV, but none of those tests revealed plaintiff's AVM.

On May 20, 2011, plaintiff consulted radiologist Maksim Shapiro, M.D., of NYU Langone Medical Center. Dr. Shapiro observed that plaintiff's November 2, 2010 CT scan did not reveal any evidence of a hemorrhage, and that the hemorrhage likely occurred at the time of plaintiff's very severe headache on November 30. Dr. Shapiro opined that the hemorrhage was unrelated to plaintiff's fall and appeared to be spontaneous.

On May 24, 2011, plaintiff underwent an MRI and MRA of the brain, which revealed a remote hemorrhage. Both Dr. Shapiro and Dr. Govindan Gopinathan, a neurologist at NYU Langone Medical Center, then recommended that plaintiff undergo an angiogram to check for a possible AVM.

On June 13, 2011, Dr. Rafael Ortiz of St. Luke's Roosevelt Hospital performed a cerebral angiogram, which revealed an MRI-occult micro-AVM. Dr. Ortiz told plaintiff that the AVM had ruptured and could do so again, and that she needed surgery.

On July 27, 2011, Dr. Robert A. Solomon, a neurosurgeon at Columbia University Medical Center, performed a craniotomy. Following that surgery, plaintiff began to have seizures, from which she still suffers, as well as headaches, balance problems, confusion, fatigue and impaired vision.

This medical malpractice action followed. To the extent relevant for present purposes, plaintiff alleges that Dr. April was negligent in failing to order diagnostic testing that would have revealed the presence of a micro-AVM during the course of his treatment of her from November 2 through December 1, 2010. Defendants moved for summary judgment, alleging that there was no departure from the accepted standard of medical care and that, alternatively, any departures did not proximately cause plaintiff's injuries.

Defendants established their entitlement to judgment as a matter of law. Defendants submitted, inter alia, an affirmation of a neurologist and plaintiff's medical records, which demonstrated that the alleged deviations from the accepted standard of medical care did not proximately cause plaintiff's damages, as her AVM, a rare congenital condition found in one percent of the population, and mostly in male patients, was not visible on noninvasive diagnostic testing. The claim that a cerebral angiography should have been performed prior to plaintiff's hemorrhage was inconsistent with the accepted standard of medical care, as shown by plaintiff's course of treatment involving several doctors affiliated with three different hospitals, and any subsequent testing would not have changed plaintiff's course (see Foster-Sturrup v Long, 95 AD3d 726, 727-728 [1st Dept 2012]).

In opposition, plaintiffs failed to raise a triable issue of fact. Plaintiffs submitted the affirmation of a neurological expert offering opinions in conclusory fashion, without evidentiary substantiation. Plaintiffs' neurological expert opined that the accepted standard of medical care on plaintiff's presentation of symptoms following her November 30 hemorrhage was to order a "cerebral MRI and MRA or CTA [computed tomography angiography] or conventional cerebral angiography." The disjunctive phrasing of this statement apparently indicates that, in plaintiffs' expert's view, performance of either noninvasive or invasive testing would have been sufficient to meet the accepted standard of medical care. Put otherwise, the apparent view of the expert is that the performance of noninvasive tests such as an MRI and MRA would have obviated the need for a cerebral angiogram.

The record clearly establishes, however, that plaintiff's

micro-AVM was MRI-occult, and thus was never detectable by means of noninvasive testing, including the December 7, 2010 MRI, the December 10, 2010 multiple tests (MRI, MRA and MRV) and the May 24, 2011 MRI and MRA ordered by doctors other than defendant.

Plaintiffs' expert's conclusory opinion that noninvasive testing would have led to an earlier diagnosis failed to address the opinion of defendants' expert (based on the noninvasive testing over the six-month period after plaintiff left defendant's care) that the MRI-occult AVM was not diagnosable by such testing. Moreover, plaintiffs' expert failed to identify a basis for the apparent conclusion that, as an alternative to noninvasive testing, cerebral angiography was indicated prior to plaintiff's November 30, 2010 hemorrhage (*see Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002]; *G.L. v Harawitz*, 146 AD3d 476, 476 [1st Dept 2017]; *Holmes v Bronx-Lebanon Hosp. Ctr.*, 128 AD3d 596 [1st Dept 2015]).

Moreover, the course of events from the date of plaintiff's injury to the final date of plaintiff's treatment by Dr. April on December 1 makes clear that, throughout that period, there was never any indication of a need for a differential diagnosis. Aside from the fact that none of the tests performed by Dr. April revealed anything remarkable, plaintiff's head injury and the symptoms that followed formed the basis for Dr. April's initial diagnosis of post-concussive headache syndrome. Dr. April's later diagnosis of migraines followed plaintiff's having reported to him that she underwent an MRI as an adolescent in 1990 in connection with her having experienced migraines. In addition, plaintiff's family medical history revealed that both plaintiff's mother and her aunt had suffered from migraines.

While an angiogram may have revealed plaintiff's AVM prior to the hemorrhage she suffered on November 30, plaintiffs' expert offered no probative evidence that performance of a risky, invasive angiogram was indicated at the time in question. As the AVM was an unindicated condition at that time, Dr. April's failure to seek a differential diagnosis was not malpractice (*see David v Hutchinson,* 114 AD3d 412, 413 [1st Dept 2014] ["the failure to investigate a condition (by performing testing) that would have led to an incidental discovery of an unindicated condition, does not constitute malpractice"]; *Curry v Dr. Elena Vezza Physician, P.C.,* 106 AD3d 413, 413 [1st Dept 2013] ["failing to investigate an otherwise unindicated disease is not malpractice"]; *see also Montilla v St. Luke's-Roosevelt Hosp.,* 147 AD3d 404, 404, 405, 407 [1st Dept 2017] [affirming

judgment dismissing complaint where hemorrhage detected by CT scan had not been detected by similar scan four days earlier and where the plaintiffs' neurological expert's opinion as to possible causes of hemorrhage was theoretical and not based on all relevant record evidence, rendering opinion insufficient], citing *Callistro v Bebbington*, 94 AD3d 408, 410-411 [1st Dept 2012], *affd* 20 NY3d 945 [2012]).

Even had Dr. April sought a differential diagnosis, there is no guarantee that plaintiff's AVM would have been detected, because Dr. April could have ordered only noninvasive testing, such as an MRI and MRA, and would still have met the accepted standard of medical care. There is no dispute that these tests—while sufficient to constitute "correct diagnostic procedures" and meet what is, according to plaintiffs' expert, the accepted standard of medical care—would not have detected the AVM.

The alternative for Dr. April, in plaintiffs' expert's view, would have been to perform a cerebral angiography. The dissent's view that plaintiff's symptoms at the point of time in question "might well have pointed to an AVM" and that an AVM would have been discovered with an angiogram amounts to nothing more than speculation, which we have consistently found inadequate to rebut a defendant's prima facie showing on a summary judgment motion (*see e.g. Diaz*, 99 NY2d at 544; *G.L. v Harawitz*, 146 AD3d at 476; *Curry*, 106 AD3d at 414; *Rodriguez v Montefiore Med. Ctr.*, 28 AD3d 357, 357 [1st Dept 2006] [the plaintiff's expert failed to raise a triable issue of fact based upon her conclusory and speculative assertions that more aggressive treatment would have led to earlier detection of the plaintiff's cancer]).

Furthermore, plaintiffs' expert's affirmation failed to demonstrate, by way of evidentiary substantiation, that Dr. April's conduct was a proximate cause of damages to plaintiff. Plaintiffs' expert's claim that Dr. April's alleged diagnostic failure exacerbated plaintiff's congenital AVM condition is utterly devoid of factual support.

In the absence of any probative evidence that Dr. April deviated from the accepted standard of medical care and that his conduct was a proximate cause of plaintiff's damages, Supreme Court properly granted defendants' motion for summary judgment dismissing the complaint.

The dissent's attempt to distinguish *David* is unavailing. In *David*, we held that the failure to conduct testing that would have led to the discovery of an unindicated condition does not constitute malpractice (114 AD3d at 413). That same principle

applies here, in that plaintiff's AVM was, at the time in question, an unindicated condition.

The dissent's effort to distinguish *Montilla* is similarly unavailing. Here, as in *Montilla*, plaintiffs' expert failed to rebut the views advanced by defendants' expert on significant issues and to adduce sufficient evidentiary support for plaintiffs' expert's own views (*see* 147 AD3d at 407). Specifically, here, plaintiffs' expert failed to address defendants' expert's opinions that plaintiff's AVM would have been undetectable by concededly appropriate noninvasive testing, and that Dr. April's conduct prior to plaintiff's hemorrhage could not have been the proximate cause of any damages to plaintiff. Concur—Sweeny, J.P., Andrias and Kahn, JJ.

Mazzarelli and Moskowitz, JJ., dissent in a memorandum by Moskowitz, J., as follows: I disagree with the majority that the affirmation of plaintiff's neurological expert was "conclusory" and "without evidentiary substantiation." On the contrary, plaintiff's neurological expert specifically identified numerous deviations from the standard of care and noted that plaintiff showed multiple AVM symptoms before her rupture, including headaches, two or three falls, severe head pain, weakness, and visual disturbance, all of which increased after the initial visit. Because I conclude that these assertions raise issues of fact sufficient to defeat summary judgment, I respectfully dissent.

In this medical malpractice action, plaintiffs alleged that defendant Dr. Robert S. April was negligent in, among other things, failing to order diagnostic testing that could have revealed the presence of a micro-arteriovenous malformation (AVM), a congenital condition in the injured plaintiff's brain. According to plaintiffs, had Dr. April ordered the proper tests, the injured plaintiff might not have suffered neurological damage, which, she alleges, has led to seizures, headaches, difficulty with her sense of balance, and impaired spatial vision.

Defendants failed to establish their entitlement to judgment as a matter of law. On their motion, defendants submitted, among other things, the injured plaintiff's medical records and an affirmation of a neurologist, both of which purported to demonstrate that the alleged deviations from the accepted standard of medical care did not proximately cause plaintiff's damages. Those documents showed that plaintiff's AVM was not visible on noninvasive diagnostic testing, but would have been visible only by invasive cerebral angiography. Defendants noted that the latter test, however, would have been inconsistent with the standard of care, as it carried significant risks inappropriate for that stage of treatment. Further, defendants

argued, the assertion that they should have performed a cerebral angiography before plaintiff's hemorrhage did not support the medical malpractice claim, because the bleed had already occurred and any subsequent testing would not have changed the course of plaintiff's health (see *Foster-Sturrup v Long*, 95 AD3d 726, 727-728 [1st Dept 2012]). This showing was sufficient for defendants to make out a prima facie case of their entitlement to summary judgment. The burden therefore shifted to plaintiffs to present evidence in admissible form demonstrating the existence of triable issues of fact (see *Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

Here, plaintiffs did sufficiently make that showing in their opposition, presenting evidence that raised triable issues of fact by way of their neurological expert's opinion. The neurological expert examined plaintiff's chart, particularly her various complaints over time of recurrent falls, vision failure, and headaches. After that review, the neurologist opined that Dr. April deviated from the standard of care by failing to engage in a differential diagnosis, failing to order a cerebral angiography and other tests such as MRIs and MRAs, engaging in "head shaking" or "head impact testing," prescribing contraindicated medications, and failing to obtain a neurological consultation. According to plaintiffs' expert, with a reasonable degree of medical certainty, these departures, particularly the failure to order and have performed the indicated tests between November 2, and November 30, 2010, prevented early detection and removal of the AVM before its rupture, causing plaintiff's injuries. This conclusion was sufficiently particularized to raise triable issues of fact, thus defeating defendants' motion for summary judgment (see *Polanco v Reed*, 105 AD3d 438, 440-441 [1st Dept 2013]).

As defendants concede on appeal, no party disputes that an angiogram would have revealed the congenital malformation in plaintiff's brain. But the question is whether the angiogram was actually indicated. Plaintiffs' expert directly addresses this question in the expert affirmation, stating that given plaintiff's history and the clinical course of her neurological deterioration, defendants should have performed a differential diagnosis of her symptoms to rule out various possible conditions, including seizure disorder or intracranial infection. There is nothing conclusory about this opinion; it simply creates a question of fact as to whether defendants should have performed a differential diagnosis before the AVM advanced to the point where it caused permanent neurological damage (see *Adams v Pilarte*, 152 AD3d 97 [1st Dept 2017]).

That plaintiffs' expert offers an opinion in the disjunctive, as the majority notes, does not change the result ("Dr. April deviated from the accepted standard of medical care in not ordering indicated tests . . . including cerebral MRI [magnetic resonance imaging test] and MRA [magnetic resonance angiogram] or . . . conventional cerebral angiography"). On the contrary, the very point of plaintiffs' expert's opinion is that the failure to order any sort of test other than an EEG was part of defendants' failure to perform a differential diagnosis.

The cases that the majority cites do not compel any result to the contrary. In *David v Hutchinson* (114 AD3d 412, 412 [1st Dept 2014]), the decedent complained of abdominal pain during an emergency room visit following gallbladder removal surgery 11 days earlier. The defendants diagnosed an infection and treated the decedent for that condition, after which her complaints resolved and she was discharged after being "stable and comfortable" for several hours (*id.* at 412, 413). The decedent was later found to have liver abscesses and pleural effusion, and died from infections related to her repeated stays in hospitals and nursing homes (*id.* at 412). Under those circumstances, we found, among other things, that the failure to investigate a condition that would have led to an incidental discovery of an unindicated condition does not constitute malpractice (*id.* at 413).

But the question here is not one of incidental discovery of an unindicated condition. In *David*, none of the decedent's symptoms pointed to a liver abscess or pleural effusion; thus, we found in that case that the failure to test for those conditions did not constitute a deviation from the standard of care (114 AD3d at 413). Here, by contrast, as plaintiffs' expert notes in the expert affirmation, plaintiff's symptoms might well have pointed to an AVM—a condition that defendants would have discovered had they undertaken the correct diagnostic procedures.

What is more, the defense experts in *David* stated, without contradiction, that the decedent's liver abscesses had long since resolved by the time of her death, and the plaintiff's expert was unable to causally relate the liver abscesses to the decedent's death (114 AD3d at 413). Thus, in *David*, the decedent's death was not even legally connected to the condition that the defendants allegedly failed to diagnose. Here, in contrast to *David*, no expert states that plaintiff's "blinding" headaches, visual disturbances, and difficulty walking proved unrelated to her condition. Quite to the contrary, plaintiffs' expert opines that plaintiff's symptoms were consistent with an AVM, among other things.

In *Montilla v St. Luke's-Roosevelt Hosp.* (147 AD3d 404, 407 [1st Dept 2017]), the plaintiff's expert never addressed the assertion of the defendant's expert that there was no radiological evidence of trauma in the decedent's brain, and omitted facts regarding the rise in the decedent's blood pressure, thus ignoring relevant record evidence about what had caused the decedent's injury. As noted above, plaintiffs' expert directly addresses the issues raised by defendants' expert. Nor does the majority point to any relevant record evidence that plaintiffs' expert ignored in reaching his or her conclusion.